AO 91 (Rev. 11/11) Criminal Complaint

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED
*December 01, 2021*
Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

| | |
|---|---|
| United States of America<br>v.<br>**ANTHONY OBUTE**<br><br>*Defendant(s)* | Case No.  **4:21-mj-2519** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **December 1, 2021** in the county of **Harris** in the **Southern** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute a controlled substance |

This criminal complaint is based on these facts:

See attached Affidavit in support of the Criminal Complaint.

☑ Continued on the attached sheet.

_____
Complainant's signature
Michael Henson, Task Force Officer, DEA
Printed name and title

Sworn to before me telephonically.

Date: 12/01/2021

_____
Judge's signature
City and state: Houston, Texas
United States Magistrate Judge Dena Hanovice Palermo
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Michael E. Henson, being duly sworn, hereby depose and state as follows:

1. I have been a licensed police officer for over 25 years and am currently employed by the Dickinson Police Department as a Detective in the Criminal Investigations Division. I also hold a Master Police Officer License. I have been a narcotics investigator for over 16 years and have held positions with the Galveston County Narcotic Task Force, United States Customs, and the Texas Department of Public Safety Narcotic Services.

2. Since 2010, I have been a Task Force Officer ("TFO") assigned to the Drug Enforcement Administration ("DEA"), Galveston Resident Office ("GRO"). The GRO is a multi-agency task force that investigates the illegal trafficking of illicit drugs and pharmaceutical controlled substances. The Task Force is comprised of agents from the DEA, Internal Revenue Service, Homeland Security, and personnel from state and local law enforcement assigned as TFOs. I have attended specialized training both with DEA and through the Texas Narcotic Officers Association concerning violations of the federal Controlled Substances Act.

3. I have received many hours of formal training in the detection and apprehension of persons involved in the illegal trafficking of illicit and pharmaceutical narcotics, including comprehensive, formalized instruction in such matters as narcotics identification, detection, trafficking, and interdiction; money laundering techniques; and asset identification, seizure, and forfeiture. This training has included instruction on recovering and analyzing evidence from electronic devices, including cellular phones.

4. As a TFO with DEA, I have initiated numerous federal and state investigations into pharmaceutical drug trafficking, several of which have resulted in the arrest and conviction of individuals that have illegally distributed controlled substances, both illicit and pharmaceutical, as

well as the seizure of drugs and proceeds derived from the sale of those drugs. I have become familiar with how drug trafficking organizations ("DTOs") operate pharmacies as fronts for the illegal distribution of Schedule II opioids including hydrocodone and oxycodone, and of other controlled pharmaceutical drugs, such as carisoprodol, alprazolam, and promethazine syrup with codeine (often referred to as "potentiators"), that are known to enhance an illicit user's opioid "high." In addition to what I have learned from personal observation during my own investigations about the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances, I have gained knowledge about these matters from conversations with pharmacists, physicians, diversion investigators, state medical board investigators, pharmacy board investigators, and others.

5. I have also conducted and participated in debriefing many drug traffickers and money launderers, through which I have learned valuable information regarding the techniques used by DTOs to distribute both illicit and pharmaceutical drugs, and to conceal the proceeds thereof, in both domestic and international markets. In addition, I am familiar with the ways in which illicit and pharmaceutical narcotics traffickers use vehicles and electronic devices, including cellular telephones, to conduct their illegal business.

6. The information in this affidavit is based upon my personal knowledge and information provided to me by others, including other law enforcement personnel, as well as sources of information, records, documents, and surveillance conducted, obtained, and reviewed by law enforcement officers.

7. I make this affidavit in support of a criminal complaint and federal arrest warrant for Anthony OBUTE ("OBUTE"), who owns and operates KEYSTONE PHARMACY ("KEYSTONE"), and who was its sole employee for most of September 1, 2018, through

September 1, 2020. The information contained in this affidavit is submitted for the sole purpose of establishing that there is probable cause to believe that on or about May 28, 2020, and again on or about August 4, 2020, in the Southern District of Texas, OBUTE did knowingly and willfully distribute and dispense, and cause KEYSTONE to distribute and dispense, hydrocodone and carisoprodol, outside the scope of professional practice and without any legitimate medical purpose, in violation of 21 U.S.C. § 841.

8.     Because this affidavit is submitted for the limited purpose of securing authorization for a criminal complaint, I have not included every fact known to me or other law enforcement officers concerning this investigation. I have set forth only the facts essential to establish probable cause for the requested complaint.

## BACKGROUND

### I.     Relevant Statutes and Controlled Substances

9.     21 U.S.C. § 841(a)(1) makes it unlawful for any person to, *inter alia*, knowingly and intentionally possess with the intent to distribute or dispense a controlled substance, or to distribute or dispense a controlled substance except as authorized by law.

10.    21 U.S.C. § 812 establishes five schedules of controlled substances—Schedules I, II, III, IV, and V—based on the drug's potential for abuse, its currently accepted medical use, and the severity of physical or psychological dependence that could result from its abuse. Pharmaceutical controlled substances are listed in Schedules II through V because they are considered drugs for which there is an accepted medical use, but which pose a substantial potential for abuse and addiction. Relevant here,

> a.     **Hydrocodone** is the generic name for a Schedule II narcotic analgesic. Hydrocodone is sold under several brand names, including Norco. The highest-strength quick-release hydrocodone pill commercially available contains 10mg of hydrocodone bitartrate and 325mg or more of a non-narcotic analgesic like acetaminophen. Hydrocodone 10-325mg pills typically have a street value of between $5 to $7.

b. **Oxycodone** is a Schedule II narcotic analgesic drug that is typically prescribed for moderate-to-severe pain relief. Oxycodone is sold under brand names including Roxicodone, and it is sometimes referred to as "synthetic heroin" or "hillbilly heroin," as its chemical composition, effects, and potential for addiction are similar to those of heroin. The highest-strength short-acting (non-extended-release) oxycodone pill contains 30mg of oxycodone hydrochloride. In this form, oxycodone's street value is approximately $1 per milligram. Oxycodone is also frequently diverted in the form of tablets containing 10mg of oxycodone hydrochloride and or more of a non-narcotic analgesic like acetaminophen, which is sold under brand names including Percocet.

c. "**Potentiators**," so-called because they enhance the high from opioids like hydrocodone, include **carisoprodol**, a Schedule IV controlled substance classified as a muscle relaxant.

11. According to 21 C.F.R. § 1306.14, every person who dispenses a controlled substance must be registered to do so with the DEA, pursuant to a valid prescription. 21 C.F.R. § 1306.04(a) further provides for a corresponding responsibility between prescriber and pharmacist:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . .

12. Under 22 Texas Admin. Code § 291.29(a), pharmacies must "make every reasonable effort" to detect and prevent drug diversion. Section 291.29(b) of the same Code states that a pharmacy shall not dispense a prescription drug if "the pharmacist knows or should have known that the order for such drug" was invalid, including because it "issued without a valid pre-existing patient-practitioner relationship." Reasons to suspect that a prescription may have been issued without valid patient-practitioner relationship or in violation of the practitioner's standard of practice are enumerated in both the Texas Administrative Code and in a document the Texas State Pharmacy Board ("TSBP") distributes to all new registrants, and again at all routine inspections, called *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF…*. To summarize:

a. filling a reasonably discernible <u>pattern of substantially identical prescriptions</u> for the same controlled substances or combinations of controlled substances;

      b.    filling prescriptions for <u>prescribers who frequently write identical prescriptions</u> for numerous people, indicating a lack of individual dosing;

      c.    multiple people bring in <u>prescriptions for controlled substances from the same prescriber</u>;

      d.    routinely filling prescriptions for known <u>drugs of abuse, alone or in combination</u>, including opioids, benzodiazepines, muscle relaxants, and psychostimulants;

      e.    routinely filling prescriptions for the <u>highest strength</u> and/or for <u>large quantities</u> of these drugs;

      f.    routinely filling opioid prescriptions by <u>physicians without a pain specialty</u> and <u>clinics not registered as pain management clinics</u>;

      g.    the controlled substance(s) or the quantity of the <u>controlled substance(s) prescribed are otherwise inconsistent with the practitioner's area of medical practice</u>;

      h.    the Texas Prescription Monitoring Program ("PMP")[1] reflects that <u>the patient is doctor- or pharmacy-shopping</u> (obtaining similar drugs from multiple doctors and/or pharmacies);

      i.    charging <u>above-market rates</u> and accepting <u>mostly/only cash or credit (instead of insurance)</u> for known drugs of abuse;

      j.    sporadic and <u>non-consistent hours of operation and dispensing</u> volume (including zero dispensing) from day to day, and week to week; and

      k.    routinely ordering controlled substances from <u>more than one drug supplier</u>, which is often reflected in DEA's ARCOS database.[2]

---

[1] The Prescription Monitoring Program ("PMP") is a database of all reported prescriptions for controlled substances that are issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") up until September 1, 2016, and thereafter by the TSBP. TSBP requires that Texas pharmacies report all dispensed controlled substances records to the Texas PMP no later than the next business day after the prescription is filled. The PMP data is searchable by provider, patient, and pharmacy. Pill-mill pharmacies often fail to report the controlled substance(s) they dispense to the PMP, as Texas law requires.

[2] The DEA requires manufacturers and distributors of bulk or dosage forms of controlled substances to report all inventories, acquisitions, and dispositions of all Schedule I and II controlled substances to DEA's Automation of Reports and Consolidated Orders System ("ARCOS"). Among other things, DEA uses ARCOS to determine if pharmacies are accurately reporting the number of controlled substances pharmacies are dispensing. I know from my training and experience that when pharmacies fail to report the number of controlled substances dispensed, it often evidences that those drugs are being diverted to the illegal drug market.

## II. The illegal process of diverting prescription drugs

13. Based upon my training and experience, from my participation in this investigation and others like it, and from conversations with other law enforcement officers and DEA Diversion Investigators who regularly conduct similar investigations, I know that:

    a. Pill-mill clinics and pharmacies are generally comprised of owners and operators; physicians, pharmacists, and other medical providers; and office staff;

    b. A "crew leader" is someone who finds and usually pays individuals, some of whom are homeless or impoverished, to pose as pain patients; transports them (often in groups) to the clinic; coaches the patients on how to fill out intake documentation to support a prescription for pain medication (or simply does it for them) and what "magic words" the particular pill-mill doctor requires to issue an illegitimate prescription for the sought after controlled substances; pays for the "visit with the doctor" (i.e., the illegitimate prescription); takes the patient (or just the illegitimate prescription) to the pharmacy; and pays for and takes control of the prescription drugs, to divert and sell them on the street for profit;

    c. Often, pill-mill clinic and pharmacy owners/operators coordinate each other and with the crew leaders to set aside a limited number of appointments ("slots") for individuals the crew leaders can run through the system, in an effort to keep dispensing numbers at a level they believe will maximize profit while still allowing them to stay under the radar of DEA, the state pharmacy and medical boards, and other law enforcement and oversight agencies;

    d. Pill-mill clinics often charge a flat fee, paid up front—before the patient sees the physician—in cash, based on the controlled substance the physician will later prescribe. For example, a patient might pay $300 at the beginning of a visit knowing the resulting prescription will be for hydrocodone and carisoprodol, or $500 at the beginning of a visit knowing the resulting prescription will be for oxycodone and carisoprodol. A pill-mill clinic doctor visit—if any—usually involves only a perfunctory consultation. At the conclusion of the visit, the physician almost always orders a Schedule II opioid, such as hydrocodone or oxycodone, and routinely a second for a Schedule IV drug such as carisoprodol. These prescriptions are issued without a legitimate medical purpose and outside the scope of professional practice;

    e. Pill-mill pharmacies often allow or even require crew leaders to purchase their purported patients' drugs without bringing the patient to the pharmacy, so long as the crew leader provides a copy of the individual's identification and the cash. The crew leaders usually pay in cash, even if the purported patients have insurance, which allows the pharmacy to charge above-market rates without leaving a paper trail for DEA, the pharmacy board, and other law enforcement and oversight agencies. For example, according to pharmacists with knowledge of market rates, legitimate pharmacies may charge $42.00 for 120 pills of oxycodone 30mg and $6.00 for 90 pills of carisoprodol

350mg, while pill-mill pharmacies charge as much as $1,340 for that combination. These prices reflect the high market value of the drugs on the black market; and

    f.    Based on my training and experience, I know that pill-mill clinics and pharmacies often attempt to avoid detection by law enforcement and oversight agencies by: falsifying patient records and prescriptions, accepting a combination of pain management and family medicine patients, requiring appointments, requiring patients to have prior prescriptions for controlled substances on the PMP, papering patient files with x-ray or MRI results that are rarely reviewed or verified, maintaining irregular business hours, and depositing only a portion of the cash proceeds in the bank.

## FACTS ESTABLISHING PROBABLE CAUSE

14.    On May 28, 2020, officers conducting surveillance observed suspected crew leader Krisean Johnson ("Johnson") and a passenger leave KEYSTONE, a suspected pill-mill pharmacy, located at 9301 Gulf Freeway, Houston, Texas 77017, in Johnson's vehicle. Johnson was stopped and arrested for driving without a valid license. Officers who inventoried the vehicle found several pill bottles in the center console. Two contained 110 dosage units of hydrocodone 10-325mg and 30 carisoprodol 350mg, respectively, both prescribed by a suspected pill-mill doctor to a purported patient, W.S., who was not with Johnson in the vehicle. The labels on both of W.S.'s bottles indicated they had been filled at KEYSTONE that day. Officers also located in Johnson's vehicle the state identification cards for W.S. and two other individuals not in Johnson's vehicle.

15.    Officers also located two pill bottles in Johnson's name with older labels (reflecting prescriptions filled in or around March 2020), which contained 100 dosage units of hydrocodone 10-325mg and 19 carisoprodol 350mg, respectively. Johnson told officers that he transferred his newer medications into older bottles, but he could not provide any legitimate reason for doing so. The officers conducted a "pat down" of Johnson's passenger, which revealed a large bundle of cash ($6,050.00). The passenger stated Johnson instructed him to hold the cash when officers initiated the traffic stop.

16.     I know from training and experience that crew leaders often carry large amounts of cash and the identifications of purported patients because pill-mill pharmacies like KEYSTONE only take cash, and do not require the crew leader to bring in the purported patient in order to purchase their illegitimately prescribed medications. I know from conversations with Diversion Investigators with DEA that it is outside the scope of pharmacy practice to allow individuals to present identifications and large amounts of cash to purchase controlled drugs—especially those known to be frequently diverted and dangerous when taken in combination, like hydrocodone and carisoprodol—for individuals without any apparent relationship to the purchaser.

17.     I conducted a toll analysis on a number that I know from a reliable confidential source ("CS#1") is used by Johnson, (409) 526-8301. The analysis revealed that Johnson was in frequent contact with a number that I know from my investigation to be used by OBUTE. I know from the investigation, including credible information from another reliable confidential source ("CS#2"), that OBUTE's cell phone number is (832) 758-7374, which records from his provider confirm is registered to Anthony I. OBUTE. Toll analysis of OBUTE's cell phone records reflects that from in or around March 2020 through in or around June 2020, the month after Johnson was arrested, (409) 526-8301—Johnson's cell phone number—was OBUTE's top contact during that timeframe. I believe that OBUTE's frequent contact with Johnson, and investigators' frequent observation of Johnson going to and from KEYSTONE, is further evidence that Johnson and OBUTE were trafficking in controlled pharmaceutical drugs.

18.     On August 4, 2020, officers conducting surveillance at a suspected pill-mill clinic operated by Shivarajpur Ravi observed a known crew leader arrive at the clinic and meet with an unidentified male officers saw exit the clinic. The crew leader later provided DEA with what I believe to be credible information about KEYSTONE, so I refer to him here as SOI#1.

19. After officers witnessed SOI#1 meet with the unidentified male, they followed SOI#1 to KEYSTONE, where SOI#1 parked and waited for approximately 25 minutes before walking into the pharmacy. SOI#1 exited KEYSTONE about 20 minutes later and returned to his vehicle. SOI#1 was stopped a short time later for failure to signal during a lane change. After the SOI#1 was placed in the back of the squad car, investigators saw a pill bottle on the floor next to his feet. Officers recovered that bottle and another, which the labels reflected contained hydrocodone and carisoprodol had been prescribed the same day by Ravi for "patient" D.M.H. SOI#1 admitted to having attempted to conceal the medications in his crotch area.

20. SOI#1 further admitted to officers that he regularly received prescriptions from Ravi, both his own (though he claimed not to have any medical problems) and those of other purported patients he brought to Ravi's clinic as a crew leader, and whom he paid around $100 per visit, on top of the approximately $350 per visit SOI#1 paid Ravi's clinic. SOI#1 admitted that some of his purported patients' Ravi prescriptions would be sent to KEYSTONE, and that OBUTE allowed SOI#1 to use photocopied driver's licenses to obtain medications prescribed to those individuals by Ravi. SOI#1 stated he paid the pharmacist "Tony" (OBUTE) $400 cash for each "bag" of Norco (hydrocodone 10-325mg) and Soma (carisoprodol 350mg). I know from training and experience that $400 is far more than a legitimate pharmacy would charge for that combination of drugs. I also know from training and experience a legitimate pharmacy would not allow crew leaders to purchase and carry off prescriptions for dangerous combinations of controlled drugs prescribed to other individuals with whom the crew leaders have no apparent relationship.

21. The PMP and ARCOS data for KEYSTONE from on or about September 1, 2018, through on or about September 1, 2020, also reflects numerous red flags that OBUTE and

KEYSTONE were diverting hydrocodone, oxycodone, and carisoprodol, outside the scope of professional practice and without any legitimate medical purpose, during that time.

22. First, about 98% of the controlled drugs that KEYSTONE reported to PMP that it dispensed during that timeframe was hydrocodone 10-325mg (780,312 pills, or 59% of all controlled drugs KEYSTONE reported dispensing) and carisoprodol 350mg (523,995 pills, or 39% of all controlled drugs KEYSTONE reported dispensing)—two of the most frequently diverted controlled pharmaceutical drugs, in the exact strengths I know to be most in demand on Houston's black market. I know that there is no legitimate medical purpose that would justify this dispensing pattern (dispensing that appears "cookie cutter" as opposed to individualized, mainly comprised of notoriously diverted drugs like hydrocodone 10-325mg and carisoprodol 350mg), which is warned about in the TSBP's red flags checklist described above.

23. I also know from training and experience, and from TSBP's red flags checklist, that it is a red flag if most of a pharmacy's prescriptions for controlled drugs are written by a small group of doctors: the smaller the number of prescribers of controlled drugs, the more likely it is that the pharmacy is illegally dispensing. The same PMP analysis revealed that he top prescribers during this timeframe were Shivararajpur Ravi and Katherine Thompson, who collectively accounted for approximately 50% of all the controlled substances KEYSTONE dispensed.

24. Another of TSBP's red flags for diversion is when a majority of a pharmacy's controlled-drug customers are cash or self-pay. I know from conversations with reliable confidential sources ("CSs") and SOI#1, among other means, that during the timeframe in question, KEYSTONE only took cash. According to SOI#1, at the time of his encounter with law enforcement in August 2020, KEYSTONE was charging $400 for the combination of 120 hydrocodone 10-325mg pills and 90 carisoprodol 350mg pills. I know from training and

experience that the same combination would have cost roughly a tenth of that amount (around $35) at most major retail pharmacies at that time, which is also a red flag for diversion.

25. In addition, I know that it is a red flag when wholesalers report to ARCOS that they sell a pharmacy significantly more pills than the pharmacy reports dispensing over a given timeframe. Comparing KEYSTONE's PMP to ARCOS reported by wholesalers from on or about September 1, 2018, to on or about September 1, 2020, wholesalers reported selling KEYSTONE approximately 141,100 pills of oxycodone 30mg, while KEYSTONE only reported dispensing approximately 15,265 pills of that drug (i.e., approximately 11% of what it purchased). KEYSTONE's ARCOS reflects that it purchased around 962,500 hydrocodone 10-325mg pills, while KEYSTONE reported dispensing only 780,312 pills of that drug during this timeframe (i.e., 81% of the amount it purchased). I know such disparities are a strong indicators of diversion.

## CONCLUSION

26. Based on the foregoing facts and circumstances, there is probable cause to believe that, on or about May 28, 2020, and again on or about August 4, 2020, in the Southern District of Texas, OBUTE did knowingly and willfully distribute and dispense, and cause KEYSTONE to distribute and dispense, outside the scope of professional practice and without any legitimate medical purpose, hydrocodone, a Schedule II controlled substance, and carisoprodol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

27. Therefore, I request approval of this criminal complaint and the issuance of a federal warrant to arrest OBUTE.

_____
Michael E. Henson, Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me
telephonically this __1st__ day of December, 2021.   and I find probable cause.

_____
Hon. Dena Hanovice Palermo
UNITED STATES MAGISTRATE JUDGE